# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1003V**

---

CARLOS DIAZ,

                    Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                    Respondent.

---

Chief Special Master Corcoran

Filed: February 24, 2025

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Madelyn Weeks, U.S. Department of Justice, Washington, DC,* for Respondent.

## DECISION AWARDING DAMAGES[1]

On August 12, 2020, Carlos Diaz filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 11, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Although I ruled in Petitioner's favor on entitlement (ECF No. 43), the parties were unable to resolve damages. The question of damages has been fully briefed and is ripe for resolution (ECF Nos. 50, 51, 52). For the reasons set forth below, I find that Petitioner

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

is entitled to a damages award of **$115,000.00 for actual pain and suffering, plus $2,992.88 for out of pocket expenses.**

## I.    Relevant Facts[3]

### A. Medical Records

On October 11, 2017, Petitioner received an intramuscular flu vaccine in his right arm at a CVS pharmacy.[4] Ex. 1 at 3-4; Ex. 13 at 2; Ex. 14 at 1-2; Ex. 15 at 1-3. Over three months later (January 22, 2018), Petitioner saw nurse practitioner ("NP") Michelle Allyn. Ex. 3 at 22. Petitioner complained of right upper arm pain that began after vaccination. *Id.* He described a sharp, stabbing pain that he rated as eight out of ten. *Id.* On examination, his right lateral deltoid was tender and he had limited right shoulder active range of motion ("ROM"). *Id.* at 23. His right shoulder active elevation/abduction was 45 degrees and painful. *Id.* He had negative impingement signs on both shoulders. *Id.* Petitioner was assessed with right shoulder pain and sent for an ultrasound of his rotator cuff to determine if there was any injury from the flu shot. *Id.* NP Allyn explained that it "may be coincidental that [Petitioner] received the shot in this arm and is having this pain in the right arm." *Id.*

A week later (January 29, 2018), Petitioner underwent a right shoulder ultrasound. Ex. 4 at 22. The ultrasound revealed possible tendinosis or tendinopathy of the supraspinatus tendon, with an MRI advised for a more sensitive evaluation. *Id.* There was no evidence of fluid collection or joint effusion. *Id.*

The following week, on February 5, 2018, Petitioner saw orthopedist Dr. James Mazzara. Ex. 3 at 112. Petitioner told Dr. Mazzara that he had right shoulder pain that began on October 11, 2017, after vaccination. *Id.* The pain had gradually and progressively worsened, up to seven or eight out of ten, and was worse with forward elevation. *Id.* at 112-13. He now had some stiffness and aching in his shoulder. *Id.* Dr. Mazzara determined that Petitioner had impingement syndrome of the right shoulder with deficits in internal rotation. *Id.* He recommended a steroid injection, but Petitioner opted to try oral anti-inflammatory medication instead, and home exercises and formal physical therapy ("PT") were also proposed. *Id.*

Four days later (February 9, 2018), Petitioner underwent a PT evaluation for his right shoulder. Ex. 5 at 57. Petitioner complained of pain in his lateral shoulder that ranged between five and seven out of ten. *Id.* Activities such as donning a shirt, reaching

---

[3] While I have reviewed the entire record, this decision discusses only the evidence relevant to the parties' dispute.

[4] Although the vaccination records were inconsistent concerning which arm the vaccine was administered in, I previously found that it was most likely administered in Petitioner's right arm. *Diaz v. Sec'y of Health & Human Servs.*, No. 20-1003, 2023 WL8440873 (Fed. Cl. Spec. Mstr. Nov. 1, 2023).

overhead, and sleep made his pain worse. *Id.* On examination, his active ROM was 170 degrees in flexion and abduction for both shoulders. *Id.* at 58. His right shoulder had reduced strength and positive Neer's and Hawkins impingement signs. *Id.* At a PT session ten days later, Petitioner's right shoulder ROM had worsened to 130 degrees in abduction. *Id.* at 28. Petitioner attended a total of 20 PT sessions between February 9 and April 30, 2018. *Id.* at 24-57. At discharge (April 30th), he still rated his pain as seven out of ten, with sharp pains at night, as well as stiffness. *Id.* at 41. His right shoulder active ROM had improved to 180 degrees in flexion and abduction and 90 degrees in external rotation – which is considered normal ROM for an adult.[5] *Id.*

Petitioner continued to follow up with orthopedic physician assistant ("PA") Karl Neubecker for his right shoulder pain between February and May, 2018. Ex. 3 at 100, 104, 108. On May 7, 2018 – a week after being discharged from PT with normal ROM, but still reporting a pain level of seven out of ten – Petitioner now reported that he was 85-90% improved, and there was "no longer any pain, just a sensation of mild stiffness on occasion." *Id.* at 100. There are no treatment records relating to Petitioner's shoulder between May and September 2018.

On July 23, 2018, Petitioner was transported to the emergency department by ambulance, complaining of back pain. Ex. 4 at 1. He explained that he was lifting a truck hitch that morning and believed he lifted it wrong and felt a "pop" in his back. *Id.* at 4. Since then, he had constant lower right back pain that was worse with movement and bending. *Id.* That evening he bent down to pick something up and felt increased pain, then had difficulty standing up straight. *Id.* He did not report any problems with his arm or shoulder. On examination, he had normal ROM in all four extremities, which were non-tender to palpation. *Id.* He was diagnosed with lumbar strain and discharged with medication. *Id.* at 5.

On October 1, 2018, Petitioner returned to PA Karl Neubecker for his right shoulder adhesive capsulitis. Ex. 3 at 93. PA Neubecker administered a steroid injection in Petitioner's right glenohumeral joint.[6] *Id.* at 95.

Two weeks later (October 15, 2018), Petitioner underwent another PT evaluation for right shoulder pain and stiffness. Ex. 5 at 33. He now reported a pain level of eight out of ten. *Id.* His right shoulder active ROM had worsened to 90 degrees in flexion and 60 degrees in abduction. *Id.* at 34. His right shoulder passive ROM was 110 degrees in

---

[5] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 88 (F. A. Davis Co., 5th ed. 2016)

[6] The October 1st record states that this was Petitioner's second cortisone injection. Ex. 3 at 95. However, Petitioner's brief states that he received only one cortisone injection (Br. at 7), and no record of a previous cortisone injection has been filed.

flexion, 80 degrees in abduction, 35 degrees in external rotation, and 30 degrees in internal rotation. *Id.*

Petitioner attended ten PT sessions between October 15 and December 17, 2018. Ex. 5 at 21-33. At discharge on December 17th, he rated his pain as seven out of ten. *Id.* at 30. His right shoulder active ROM was 95 degrees in flexion and 80 degrees in abduction. His right shoulder passive ROM was 130 degrees in flexion, 120 degrees in abduction, and 55 degrees in external and internal rotation. *Id.*

Petitioner continued to treat with an orthopedist in 2018-19. Ex. 3 at 83-95. A right shoulder MRI on February 11, 2019 showed mild supraspinatus, infraspinatus, and subscapularis tendinosis, suspected mild biceps tendinosis, and mild arthritis. Ex. 6 at 1-2. Petitioner decided to undergo surgery for his shoulder.

On April 5, 2019, Petitioner underwent a right shoulder arthroscopy with distal clavicle excision, lysis of adhesions, manipulation under anesthesia, and open biceps tenodesis. Ex. 7 at 31-33. There were no complications. *Id.* at 33.

Petitioner attended a post-operative PT evaluation on April 8, 2019. Ex. 5 at 19. He rated his pain as eight out of ten. *Id.* On examination, his right shoulder passive ROM was 80 degrees in flexion, 60 degrees in abduction, 10 degrees in external rotation, and 40 degrees in internal rotation. *Id.*

By May 24, 2019, Petitioner's ROM was improving. His right shoulder active ROM was now 125 degrees in flexion, 90 degrees in abduction, 43 degrees in external rotation, and his passive ROM was 155 degrees in flexion, 150 degrees in abduction, 80 degrees in external rotation, and 50 degrees in internal rotation. *Id.* at 15.

Petitioner attended 24 PT sessions between April 8 and July 29, 2019. Ex. 5 at 3-19. At discharge (July 29, 2019), his right shoulder active ROM was 175 degrees in flexion and abduction and 90 degrees in external rotation, and his shoulder strength was five out of five. *Id.* at 12. The physical therapist checked a box indicating "Goals Met" as the reason for discharge. *Id.* However, as to five specific treatment goals, the therapist wrote that four were met, while one (related to active ROM) was only partially met.[7] *Id.*

### B. Testimonial Statements

Petitioner filed two affidavits and two declarations in support of his claim. Exs. 8, 9, 12, 16. Petitioner describes feeling "immediate pain and discomfort" in his right arm after vaccination. Ex. 8 at ¶ 4. When the pain remained after a week, he returned to the pharmacist, who told him that people sometimes have residual soreness, but it would eventually subside. *Id.* After a month, he consulted a doctor in his office, who told

---

[7] The PT records for this date are silent on Petitioner's pain level. Ex. 5 at 3, 12.

Petitioner that the doctor's father had a similar problem and the pain took a long time to subside. *Id.* at ¶ 5.

By December 2017, Petitioner's shoulder pain had "worsened significantly" and he knew it was not a normal vaccine reaction. Ex. 8 at ¶ 6. He was unable to brush his hair, perform tasks at work, or change an oil filter in his car. *Id.* As of June 2020 (when he signed his affidavit), he stated that his shoulder had "not reached its pre-vaccine state and likely never will." *Id.* at ¶ 8. He still felt pain and had to be careful how he performed certain tasks, and his range of motion was "not what it used to be." *Id.*

Marangelis Diaz, Petitioner's wife, filed an affidavit on his behalf. Ex. 9. Ms. Diaz states that a few days after vaccination, Petitioner began to complain that his arm pain had not subsided. *Id.* at ¶ 4. He could not lift his arm or sleep on his right side. *Id.* His pain and limited mobility continued "for months." *Id.* at ¶ 5.

Dawn Tyler, Petitioner's coworker, submitted a declaration in support of his claim. Ex. 12. Ms. Tyler states that Petitioner began complaining of right shoulder pain a day or two after vaccination. *Id.* at ¶ 3. His shoulder worsened to where his motion was restricted, and the pain interfered with his daily activities. *Id.* She recalls him wearing a sling to work for several weeks after his surgery. *Id.* at ¶ 4.

## II.    The Parties' Arguments

Petitioner acknowledges that he did not seek care until approximately three months after vaccination, but notes that he complained of moderate to severe pain that he rated as eight out of ten. Petitioner's Brief in Support of Damages, filed Feb. 8, 2024, at *7 (ECF No. 50) ("Br."). He continued to have high pain levels ranging from five to eight throughout his treatment course. Br. at *7. He received one steroid injection, was prescribed pain medication, underwent several diagnostic examinations, and attended approximately 29 PT sessions prior to surgery. *Id.* He underwent surgery about 18 months after vaccination, after which he attended 24 more PT sessions, and ultimately had a good recovery. *Id.*

Petitioner relies on *Kestner*, *Smith*, and *Monson* to justify his requested award.[8] He argues that he attended more PT sessions, and had a longer duration of symptoms and higher pain levels, than the petitioner in *Kestner*. Br. at *6-7. Even considering his initial treatment delay, Petitioner asserts his pain and suffering award should be

[8] *Kestner v. Sec'y of Health & Human Servs.*, No. 20-0025V, 2023 WL 2447499 (Fed. Cl. Spec. Mstr. Feb. 3, 2023) (pain and suffering award of $115,000.00); *Smith v. Sec'y of Health & Human Servs.*, No.19-0745V, 2021 WL 2652688 (Fed. Cl. Spec. Mstr. May 28, 2021) (pain and suffering award of $125,000.00); and *Monson v. Sec'y of Health & Human Servs.*, No. 20-1350V, 2023 WL 2524059 (Fed. Cl. Spec. Mstr. Feb. 8, 2023) (pain and suffering award of $155,000.00).

comparable to the *Smith* award. *Id*. Petitioner acknowledges that he should receive less than the *Monson* award because, although both cases involved similar initial treatment delays, the *Monson* petitioner treated for approximately twice the length of time and underwent more cortisone injections (though fewer PT sessions). *Id*.

Respondent cites *Hunt*, *Shelton*, and *Crawford* in support of his proposed award. Respondent's Response, filed April 10, 2024, at *11 (ECF No. 51) ("Resp.").[9] Respondent asserts that in resolving damages, I should consider Petitioner's personal circumstances (including his age, other conditions, treatment gaps, pain levels, and impact of injury on his life); physical examination and MRI findings; and the extent and nature of treatment and prognosis. Resp. at *10-11. On the basis of these factors, Respondent argues that I have typically awarded $105,000.00 or less in comparable cases also involving moderate SIRVAs treated by surgery. *Id*. at *11.[10]

Respondent also emphasizes that Petitioner waited three months and 11 days before seeking medical care for his shoulder, and that Petitioner's initial treatment was very conservative. Resp. at *11. By April 30, 2018 – six months after vaccination – Petitioner had "full and pain free ROM," although the PT records (Ex. 5 at 41) document that Petitioner still reported a pain level of seven on that date.[11] *Id*. And Petitioner reported an 85-90% improvement in his symptoms and no pain (with continuing occasional stiffness) on May 7, 2018. *Id*. (citing Ex. 3 at 100-02).

Petitioner then did not seek care again until nearly five months later. In the interim, he was seen at the emergency department for an injury which Respondent asserts "call[s] into question whether the petitioner's subsequent pain and treatment was related solely to his vaccine injury." Resp. at *12. Respondent adds that when Petitioner again sought shoulder treatment in October 2018, his ROM was worse than it had been previously. *Id*.

---

[9] *Hunt v. Sec'y of Health & Human Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (pain and suffering award of $95,000.00); *Shelton v. Sec'y of Health & Human Servs.*, No.19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (pain and suffering award of $97,500.00); and *Crawford v. Sec'y of Health & Human Servs.*, No.19-0544V, 2024 WL 1045147 (Fed. Cl. Spec. Mstr. Feb. 5, 2024) (pain and suffering award of $105,000.00).

[10] Respondent provides a chart listing his three cited cases and their circumstances, physical findings, and treatment/prognosis. Resp. at *11. Respondent states that unlike the petitioners in *Hunt*, *Shelton*, and *Crawford*, who each had three steroid injections, Mr. Diaz's "initial course was very conservative, consisting of twenty PT sessions, one prescription for an anti-inflammatory medication, and one steroid injection" – but does not otherwise provide much analysis as to how Petitioner's case compares to Respondent's cited cases. *Id*.

[11] The PT records are handwritten and, admittedly, difficult to read. However, the PT discharge summary of April 30, 2018 states that Petitioner reported a pain level of seven out of ten, had "partially met" a goal of pain-free ROM, and had NOT met a goal of having pain at or lower than three out of ten. Ex. 5 at 41.

Respondent contends that Petitioner's cases are distinguishable. Resp. at *12-13. The *Smith* petitioner, for example, sought care for severe pain just three days after vaccination and experienced moderate to severe pain and limitations in motion for approximately eight months before undergoing surgery. *Id.* at *13. And the *Kestner* petitioner was seen for shoulder pain just 16 days after vaccination. *Id.* Respondent adds that the *Monson* petitioner's treatment course was more extensive than that of Mr. Diaz, continuing for over four years with 42 PT sessions, four steroid injections, and two MRIs before surgery. *Id.* at *13-14.

Petitioner replies that his treatment course was lengthy, and he exhausted all conservative measures before deciding to move forward with surgery. Petitioner's Reply Brief, filed April 24, 2024, at *2 (ECF No. 52) ("Reply"). Petitioner distinguishes Respondent's cases, arguing that *Hunt* involves a petitioner with a mild to moderate SIRVA who treated for approximately 15 months – with periods of little to no pain – with surgery, 19 PT sessions, an MRI, and three steroid injections. Reply at *3. Although the *Hunt* petitioner initially reported a high pain level of eight, after her first cortisone injection she often reported milder pain levels between two and five. *Id.* at *3-4. Petitioner adds that his treatment continued longer than, and he attended double the number of PT sessions as, the *Hunt* petitioner. *Id.* at *4.

Petitioner disagrees with Respondent's argument that he should receive less than the *Shelton* petitioner. Reply at *4. The *Shelton* petitioner delayed seeking care for much longer – approximately five months – after which that petitioner did not obtain any additional treatment until over three months later. *Id.* And the *Shelton* petitioner had met all treatment goals and milestones by 14 months after vaccination – compared to Mr. Diaz, who Petitioner argues not met his goals at discharge over 21 months after vaccination (although I note that the PT discharge record, Ex. 5 at 12, shows that Petitioner had fully met four of his five goals, and partially met the fifth goal). *Id.*

Finally, Petitioner argues that *Crawford* does little to support Respondent's suggested damages award and instead shows that an award at or above $105,000.00 is justified, despite an initial treatment delay or even lengthy treatment gap later. Reply at *4-5.

## III.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks

compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain

and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

### IV.    Prior SIRVA Compensation Within SPU[12]

#### A.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[13] In only 270 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[14] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[15]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

---

[12] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[13] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[14] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[15] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[16] Agreement |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1ˢᵗ Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3ʳᵈ Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[17] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[18]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one

---

[16] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[17] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[18] *Joyce v. Sec'y of Health & Human Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.


## Analysis

Overall, Petitioner appears to have suffered a moderate SIRVA. Initially, he experienced pain levels of five to eight out of ten, with moderate ROM restrictions. He treated conservatively with PT and, by approximately seven months after vaccination, he reported an 85-90% improvement with no pain, just lingering stiffness. Ex. 3 at 100. He then did not seek care again for almost five months.

However, when he resumed care for his shoulder injury in October 2018, he again complained of moderate to severe pain levels, and now his ROM restrictions were comparable in severity. And this time, PT alone was not sufficient to resolve his condition. Ultimately, he underwent surgery 18 months after vaccination. After surgery, he continued to have moderate to severe pain and ROM limitations. With almost four months of PT, however, his condition improved and he met nearly all of his treatment goals. His treatment ended 21 months after vaccination, and included surgery, a cortisone injection, approximately 54 PT sessions, an ultrasound, MRI, and medication.

I find that the evidence does not preponderantly support a finding that Petitioner's July 2018 emergency department visit had any impact on his shoulder condition. He did not complain of shoulder pain at this visit, and on examination all extremities – including his right shoulder – had normal ROM. However, the fact that his shoulder was asymptomatic at this time is relevant to damages in that it bolsters the evidence that he had a period of relief from pain and ROM limitations.

After reviewing the record, the parties' submissions, and cited cases, I find that the most similar cases cited by the parties are *Smith* and *Crawford*. Both of those petitioners underwent surgery and one cortisone injection, as well as similar amounts of PT.

However, the *Smith* petitioner's injury was more immediately severe, as evidenced by Ms. Smith seeking care from her PCP only three days after vaccination, her PCP characterizing her injury as "urgent," and Ms. Smith repeatedly being placed on medical leave or restricted duty from work. *Smith*, 2021 WL 2652688, at *4. On the other hand, Mr. Diaz's injury continued for a longer overall duration than the *Smith* petitioner – 21 months compared to 13 months.

Mr. Diaz and the *Crawford* petitioner delayed seeking care for similar amounts of time, with Mr. Diaz seeking care a couple of weeks sooner than the *Crawford* petitioner. Both petitioners underwent surgery and relatively similar amounts of PT. And the petitioners had somewhat similar treatment courses, in that both initially improved with conservative care, but their symptoms returned after a period of time without treatment. The *Crawford* petitioner did attend somewhat more PT, and had two additional cortisone injections and overall a longer injury duration compared to Mr. Diaz. On the other hand, the *Crawford* petitioner had lengthy treatment gaps, while Mr. Diaz had only one treatment gap of just under five months.

Mr. Diaz's moderate to severe ROM limitations are noteworthy, and warrant a somewhat greater award. However, his delay in seeking care and overall treatment course (with a lengthy period of relief) tip the scale toward a slightly lower award.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $115,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[19] Additionally, I find that Petitioner is entitled to **$2,992.88 in out of pocket expenses.**[20]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $117,992.88, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

---

[19] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[20] The parties jointly concur on the calculation of this sum. Br. at *1; Resp. at 2 n. 1.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[21]


**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[21] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.